IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT EDWARD DELGADO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-643-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

Robert Edward Delgado, Seaford, Delaware. Pro se Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, Region III and Timothy Reiley, Esquire, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

---

## MEMORANDUM OPINION

Dated: September 11 , 2013
Wilmington, Delaware

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security, effective February 14, 2013, to succeed Commissioner Michael Astrue, whose term expired on February 13, 2013. Pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Carolyn W. Colvin is automatically substituted as the defendant in this action.

ROBINSON, District Judge

## I. INTRODUCTION

Robert Edward Delgado ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant"), denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434.  The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[2]

Currently before the court are the parties' cross-motions for summary judgment. (D.I. 17, 18)  For the reasons set forth below, plaintiff's motion will be granted and defendant's motion will be denied.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB on August 31, 2005, alleging disability since the onset date of June 13, 2005 due to disorders of muscle, ligament and fascia. (D.I. 12, Tr. 34, 64)  Plaintiff's application was denied initially and on reconsideration. (*Id.* at 34-35)  On August 22, 2007, the ALJ issued an unfavorable decision denying the claim for DIB and plaintiff unsuccessfully sought review by the Appeals Council.  (*Id.* at 4-6, 15-33)  Plaintiff appealed to this court and the matter was remanded upon motion

---

[2]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . .  Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .  42 U.S.C. § 405(g).

by defendant for a new hearing and additional vocational expert ("VE") testimony.  *See*
*Delgado v. Astrue*, Civ. No. 08-512-SLR at D.I. 20, 21, 24.

Upon remand, a hearing took place before an administrative law judge ("ALJ") on
January 27, 2010.  (D.I. 12, Tr. 563-582)  Plaintiff appeared, represented by his non-
attorney spouse, and plaintiff and a VE testified.  (*Id.*)  Subsequent to the hearing,
plaintiff underwent a consultative psychological examination.  (*Id.* at 488-498)  On May
26, 2010, the ALJ issued an unfavorable decision, finding plaintiff not disabled and
denying his claim for DIB.  (*Id.* at 392-407)  The ALJ found that, while plaintiff could not
perform his past work, he could perform a limited range of light work available in the
national economy.  Plaintiff submitted statements of exception to the Appeals Council,
but on March 29, 2012, it found no reason to assume jurisdiction and, therefore, the
ALJ's decision became the final agency decision subject to judicial review.  (*Id.* at 367-
69)  On May 23, 2012, plaintiff, proceeding *pro se*, filed the current action for review of
the final decision.  (D.I. 2)

### B. Background

#### 1. Medical history

In the late 1990s, plaintiff injured his right shoulder at work as he lifted a heavy
weight.  (D.I. 12, Tr. 125, 231)  Following the accident, plaintiff experienced occasional
pain, took intermittent medication, and underwent physical therapy.  (*Id.* at  231)
Plaintiff reinjured his shoulder in late 2004.  (*Id.* at 125, 231)

Dr. Craig Smucker ("Dr. Smucker") diagnosed acromioclavicular ("AC") arthritis
and recommended conservative treatment of lodocaine injections followed by operative

2

intervention only to the extent the conservative treatment failed. (*Id.* at 198) Following the first injection, plaintiff had full shoulder range of motion and was assessed "vastly improved AC arthritis." (*Id.* at 196) As of December 2004, Dr. Smucker planned to see plaintiff on an as needed basis and advised plaintiff to schedule a follow-up in the event that he required another injection. (*Id.*) Plaintiff presented to Dr. Smucker in April 2005 and indicated that his shoulder started bothering him several months earlier. (*Id.* at 195) Plaintiff was not interested in getting a cortisone shot every two to three months and wanted to "talk about the surgical possibilities" instead. (*Id.* at 194-195) Plaintiff received another injection, and it provided "significant symptomatic relief." (*Id.*) As of May 11, 2005 plaintiff's diagnoses were impingement syndrome and AC arthritis. (*Id.*)

On June 14, 2005, Dr. Smucker performed a right shoulder subacromial decompression, but "the surgery was terminated following the subacromial decompression due to fears of the small bridge of bone going to the anterior acromion[3] having excessive load placed on it if the distal clavicle were removed as a support mechanism for this portion of the bone." (*Id.* at 125-26, 163, 189, 193, 231) Postsurgical x-rays revealed no obvious signs of fracture or dislocation. (*Id.* at 127, 191) During a postsurgical follow-up, plaintiff requested a referral to the Morgan-Kalman Clinic for further evaluation and completion of his surgical course. (*Id.* at 191)

---

[3]The outer end of the scapula, extending over the shoulder joint and forming the highest point of the shoulder, to which the collarbone is attached. *The American Heritage Stedman's Medical Dictionary* 12 (2d ed. 2004).

When plaintiff was examined on June 20, 2005, he rated his pain as five out of ten, and was assessed as "minimal" pain. (*Id.* at 138-39)  Plaintiff engaged in physical therapy from June 20 through September 2, 2004. (*Id.* at 146-47)

Orthopaedic surgeon Dr. Thomas Brandon's ("Dr. Brandon") postsurgical examination of plaintiff's right shoulder on June 23, 2005 revealed no muscular atrophy, asymmetry, or scapular winging. (*Id.* at 163-64)  At the time, Dr. Brandon could not detect any acromial instability. (*Id.* at 163)  As of June 24, 2005, plaintiff's shoulder inflammation had decreased and, by June 29, 2005, plaintiff reported soreness, but not real pain. (*Id.* at 137)  On July 12, 2005, plaintiff reported doing alright, with pain ranging from two (at rest) to five (when moving) out of ten. (*Id.* at 136)  However, on July 21, 2005, plaintiff indicated pain while sleeping. (*Id.*)

Plaintiff was examined by consulting orthopaedic surgeon Dr. David Glaser ("Dr. Glaser") on July 24, 2005 for a second opinion. (*Id.* at 169-170)  Plaintiff provided a history of severe pain in the right shoulder and difficulty with external rotation and especially abduction of the right shoulder subsequent to the surgery. (*Id.* at 169)  He had acute onset of severe right shoulder pain and weakness, the exacerbation of pain caused by "removing a piece of tape off a child's toy." (*Id.*)  On August 1, 2005, Dr. Glaser recommended that plaintiff "stay the course to see how his function returns." (*Id.* at 167)  He did not believe that bone grafting was an option due to concerns that it would make plaintiff's function worse. (*Id.*)

Plaintiff was in no acute distress when he was examined by orthopaedic surgeon Dr. Edward McFarland ("Dr. McFarland") on August 3, 2005. (*Id.* at 232)  Dr. McFarland

4

recommended physical therapy to work on range of motion. (*Id.*) "If we can get his symptoms down without surgery that would clearly be optimum." (*Id.*) Dr. McFarland opined that plaintiff would need reconstructive surgery of some sort if he continued to have pain. (*Id.*) Examination by Dr. Brandon on August 12, 2005 revealed a palpable defect in the acomion and tenderness over the AC joint. (*Id.* at 158) Forward flexion was 130 to 150 degrees with pain, and internal rotation to just beyond the iliac crest. (*Id.*) Plaintiff had pain with all range of motion, but no instability. (*Id.*) As of August 24, 2005, plaintiff continued to complain of pain and it was a limiting factor. (*Id.* at 129) When he saw his primary care physician Dr. John Appiott ("Dr. Appiott") on August 30, 2005, he complained of depression due to his shoulder problem and loss of his job. (*Id.* at 175) Dr. Appiott prescribed Paxil. (*Id.*)

Plaintiff again saw Dr. McFarland on September 7, 2005. Examination revealed a diminished range of motion primarily due to pain, but Dr. McFarland did not feel a "particularly firm block to elevation." (*Id.* at 225) Dr. McFarland, a professor of orthopaedics and shoulder surgery who is affiliated with Johns Hopkins Hospital, sent plaintiff's information to the Shoulder and Elbow Society, presented plaintiff's case during a course in Chicago, and discussed "with multiple different physicians about what should or should not be done." (*Id.*) Dr. McFarland then recommended that plaintiff undergo an open reduction and internal fixation of the shoulder with a bone graft, but cautioned "there were no guarantees." (*Id.*) The surgery was scheduled for November 2005. (*Id.* at 222) On September 16, 2005, Dr. McFarland opined that plaintiff had essentially been totally disabled since the time of his original shoulder

5

surgery on his right dominant arm on June 14, 2005, due to complications that resulted in plaintiff's inability to lift his arm and to carry heavy weight. (*Id.* at 223)

Plaintiff presented to Dr. Glaser on October 10, 2005. Dr. Glaser cautioned plaintiff that, should he undergo the bone grafting procedure recommended by Dr. McFarland, a violation of the deltoid fascia might result in loss of its connection to plaintiff's acromion. (*Id.* at 165) Dr. Glaser had difficulty correlating plaintiff's complaints with the defect in the acromion. (*Id.*) Dr. Glaser was "not quite convinced that mechanical restoration of his shoulder joint is going to allow him to be satisfied with the function of his shoulder." (*Id.*) Dr. Glaser stated that the surgery recommended by Dr. McFarland was not a pain relieving type of operation, but an operation for function. (*Id.* at 165-66) He expressed his concern that there was not a clear functional deficit other than plaintiff's subjective reports of pain. (*Id.* at 166)

Plaintiff opted to proceed with surgery. Dr. Appiott cleared plaintiff for the procedure and stated on October 13, 2005 that plaintiff "has been in excellent physical condition and has no significant medical problems that would give him any serious risks." (*Id.* at 174) The procedure took place on November 3, 2005, at Johns Hopkins Hospital when Dr. McFarland performed an open reduction and internal fixation of the right acromion and an iliac crest bone graft harvest. (*Id.* at 178-180) Discharge instructions on November 5, 2005 included non-weight bearing on the right upper extremity and no range of motion of the right shoulder. (*Id.* at 178) X-rays taken on November 11, 2005 showed good positioning of the bone graft with no rotation. (*Id.* at 217) Dr. McFarland and orthopaedic surgeon Dr. Gregory Gebauer ("Dr. Gebauer")

6

performed a follow-up examination of plaintiff on November 11, 2005. (*Id.* at 217-220) Plaintiff appeared to be doing very well following his surgery. (*Id.* at 219) As of November 30, 2005, plaintiff was in no acute distress and had full range of motion of his fingers, wrists, and elbows, but the physicians did not conduct active range of motion testing of the shoulder. (*Id.* at 216).

On December 7, 2005, Dr. Smucker indicated that plaintiff should be restricted from doing any work related to lifting or carrying of objects over five pounds with his right arm, but that plaintiff's sitting, standing, walking, hearing, speaking, and traveling would not be limited so long as the restrictions on lifting and carrying heavy objects were followed. (*Id.* at 189-90) Dr. Smucker cautioned that he had not seen plaintiff or examined him within the last six months, so his "statements in regards to his abilities may not be accurate." (*Id.* at 189)

As of January 6, 2006, Dr. McFarland noted that the bone graft had stayed in position and that the deltoid repair stayed intact. (*Id.* at 211) As of January 27, 2006, Dr. McFarland noted that plaintiff was doing fairly well, and it was "reasonable for him to start doing a little more motion on his own" but to be "very careful in doing within limits of pain." (*Id.* at 210)

On February 1, 2006, Dr. M. H. Borek ("Dr. Borek"), a state agency medical consultant, completed a residual functional capacity ("RFC") assessment. (*Id.* at 199-206) Dr. Borek opined that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and that he could stand/walk or sit for about six hours in an eight-hour workday. (*Id.* at 200) He restricted plaintiff's pushing and pulling

7

abilities to minimal use of his right upper extremity.  (*Id.*)  Dr. Borek opined that plaintiff

could occasionally balance or crawl, had only minimal use of his right upper extremity

for reaching, that he should avoid concentrated exposure to extreme cold and avoid

moderate exposure to vibration but, otherwise, plaintiff had no postural, manipulative,

visual, communicative, or environmental limitations.  (*Id.* at 201-03)  Dr. Borek

determined that the severity and duration of plaintiff's symptoms were partially

disproportionate to their expected severity and duration based on his medically

determinable impairments.  (*Id.* at 204)  He explained that the treating/examining

source conclusions about plaintiff's limitations or restrictions differed from his based

upon the medical record that did not reveal problems with the left upper extremity or

standing and walking.  (*Id.* at 205-06)  Dr. Borek opined that the current maximum RFC

was for light work with minimal use of the right upper extremity.  (*Id.* at 206)

On February 26, 2006, Dr. McFarland prescribed physical therapy for plaintiff.[4]

(*Id.* at 209)  On March 3, 2006, Dr. McFarland stated that plaintiff's significant injury to

his right dominant shoulder as a result of shoulder surgery on June 14, 2005, has

"essentially rendered him 100% disabled" for his right upper extremity.  (*Id.* at 208)  Dr.

McFarland opined that plaintiff "will continue to be 100% disabled for the immediate

future which we define for the next 6 months."  (*Id.*)

As of March 20, 2006, plaintiff described his right shoulder as "a little sore."  (*Id.*

at 330)  On April 4, 2006, plaintiff reported that his pain had reduced to three or four out

of ten.  (*Id.* at 325)  On April 12, 2006, plaintiff was seen by Dr. Jason Archibald ("Dr.

---

[4]Plaintiff had regular physical therapy from early March 2006 to early August
2006.  (*Id.* at 291-335)

8

Archibald") for follow-up status post surgery.  Dr. Archibald had plaintiff continue with

physical therapy and instructed him to return for a follow-up visit in two months.  (*Id.* at

247-48)  Dr. McFarland saw plaintiff on June 16, 2006 for the follow-up visit.  (*Id.* at

245-246)  Dr. McFarland stated that he did not think plaintiff was capable of using his

right arm very much.  (*Id.* at 246)  He considered plaintiff unemployable because

plaintiff does not have the skills to do other jobs, and he could not return to his previous

job.  (*Id.*)

On June 21, 2006, Dr. Glaser opined that it was unclear if plaintiff's injuries were

permanent in nature and noted that, while plaintiff could not return to his previous

position, if "his pain can be better controlled, without significant narcotic use, then he

should be able to return back to sedentary or light duty job which requires the use of the

arm at waist level." (*Id.* at 268)  Dr. Glaser stated that plaintiff had "full use of his other

arm[,] which should allow him to accomplish lifting, reaching, and pulling of light

objects." (*Id.*)  Dr. Glaser opined that plaintiff "continues to have pain and loss of

function of the arm and has also continued to use narcotics.  It is because of these

problems that have been going on for at least the past 12 months, It is my opinion that

he should be awarded some Social Security Disability benefits." (*Id.*)

On September 22, 2006, Dr. McFarland discontinued physical therapy but told

plaintiff to stretch and work on his own.  (*Id.* at 243)  He attributed some of plaintiff's

reports of pain to "painful hardware" from the second surgery "which will need to come

out at some point." (*Id.*)  He also noted that plaintiff's AC joint tenderness was

9

"probably part of his problem," but it did not need "to be addressed immediately since he is not too exquisite."  (*Id.*)

Dr. McFarland scheduled plaintiff for surgery on February 22, 2007 to remove the screws remaining from his second surgery.  (*Id.* at 241)  On February 20, 2007, Dr. Appiott provided a pre-operative clearance for plaintiff and reported that plaintiff was "very healthy" and his physical examination was, "with the exception of his right shoulder . . . normal."  (*Id.* at 252)  On February 22, 2007, Dr. McFarland removed the retained hardware from the November 3, 2005 surgery in plaintiff's right shoulder.  (*Id.* at 239-40)  Plaintiff was seen for follow-up on March 2, 2007 and April 27, 2007.  (*Id.* at 234-236)  He engaged in physical therapy from early March 2007 through mid-May 2007.  (*Id.* at 269-290, 500)

Dr. Appiott completed a clinical assessment of pain on March 28, 2007.  (*Id.* at 264)  He stated that plaintiff's pain was present and found to be incapacitating; that physical activity such as walking, standing and bending increases the pain to the extent that medication and/or bed rest is necessary; that medication impacts plaintiff's work ability to the extent that he is restricted form the workplace and is unable to function at a productive level; and in a twenty day calendar month, plaintiff would miss approximately twenty days of work due to narcotic pain medication.  (*Id.*)  On April 27, 2007, Dr. McFarland stated that plaintiff "continues to be completely disabled for use of that upper extremity at this point in time."  (*Id.* at 234)

Physical therapy notes from April 26, 2007 indicate that plaintiff "tolerated treatment well today," was "able to complete all exercises as planned with [no increase]

of pain," and that his "prognosis continues to be excellent." (*Id.* at 275)  On May 7, 2007, Dr. McFarland completed an ongoing physician's statement of disability, stating "indefinitely disabled." (*Id.* at 263)

On August 12, 2009, plaintiff stated to Dr. McFarland and Dr. John Johansen ("Dr. Johansen") that his "condition has plateaued" and he "feels that he is unable to return to work, as his pain and weakness is significantly limiting." (*Id.* at 475)  Plaintiff continued to have pain and to take Vicodin. (*Id.*)  They planned a follow-up visit in six months. (*Id.* at 475-76)

On November 2, 2009, Dr. Joseph Schanno ("Schanno") examined plaintiff at the request of the State Disability Determination Services. (*Id.* at 477-481)  Plaintiff provided a history of dyslexia to Dr. Schanno. (*Id.* 481)  He also provided a history of taking Vicodin 7.5 mg., four to six tablets per day since his initial surgery in 2005.[5] (*Id.* at 477)  Dr. Schanno examined plaintiff and noted that there did not appear to be any major atrophy or deformity in comparing the outline and contours of the right shoulder to the left shoulder. (*Id.* at 480)  Dr. Schanno reported that, "[t]here was always tenderness when I would touch his shoulders and tried to move them, at times it seemed exaggerated. There was a reluctance to make any attempt to extend his arm above the horizontal." (*Id.* at 480)  Dr. Schanno noted two problems: (1) plaintiff is "pretty well addicted to [Vicodin] and would find it extremely hard to get off of it, and this makes it difficult to evaluate the real problem; and (2) plaintiff seemed quite resistant to

---

[5]Pharmaceutical records from Rite-Aid indicate that plaintiff filled prescriptions for Hydrocodone (generic Vicodin) on a fairly regular basis from February 20, 2006 through May 27, 2010. (D.I.12, Tr. 379-388)

11

"training for a less vigorous type of job." (*Id.* at 481)  In looking at the overall case, plaintiff is "a man with a bad shoulder that causes pain."  (*Id.*)  Dr. Schanno described plaintiff's functional limitations, as follows:

> At the present time, his physical limitations revolve around his right arm and his right shoulder.  His left shoulder has minimal changes suggestive of arthritis.  The rest of his body is quite functional and in good condition.  At this point, it would be hard to find employment for this gentleman because of his narcotic addiction and the problems that he has with using his right shoulder.  In all likelihood this will not improve in the next 12 months.

(*Id.*)  Dr. Schanno also completed an RFC assessment.  Dr. Schanno determined that plaintiff could not lift weight with his right arm, and that plaintiff could only occasionally carry ten pounds with his right arm; his left arm was unaffected.  (*Id.* at 482)  Plaintiff could sit, stand, and walk, each for three hours in an eight hour workday; with his right hand, he could occasionally reach (but never overhead), and could frequently handle, finger, and feel things, but should never push or pull with it.  (*Id.* at 484)  The left-hand function is limited to no more than frequent overhead reaching, with all other manipulative left hand functioning unimpaired.  (*Id.*)  Plaintiff should never climb ladders or scaffolds, could only occasionally balance and crawl, but could frequently stoop, kneel, crouch, and climb stairs and ramps.  (*Id.* at 485)

Plaintiff was prescribed Prozac and Zoloft because he was frustrated with his physical condition and loss of his job.  (*Id.* at 103)  When asked by a state agency representative on February 8, 2006 whether he had undergone any treatment for potential mental impairments, plaintiff responded that "he has never, nor does he plan to seek psychological treatment."  (*Id.*)  When asked whether depression might keep plaintiff from working he replied, "absolutely not."  (*Id.*)  Plaintiff was prescribed

Wellbutrin (an antidepressant) by Dr. Appiott, and prescriptions for the medication were filled during the latter part of 2006 and for most of 2007 with the last prescription filled on October 17, 2007.  (D.I. 12, Tr. 379-388)

Following the January 27, 2010 remand hearing, the ALJ scheduled a consultative psychological exam with Joseph Keyes, Ph.D. ("Dr. Keyes").  Dr. Keyes examined plaintiff on February 18, 2010.  He reported that plaintiff had an IQ of 70, with cognitive functioning in the borderline intellectual functioning range.  (*Id.* at 492, 568)  Dr. Keyes' diagnostic impression included major depressive disorder, moderate, chronic; borderline intellectual functioning; chronic pain/shoulder injury; unemployment, financial issues; and Global Assessment of Functioning (GAF) - 60.[6]  (*Id.* at 493)  Dr. Keyes stated that plaintiff's "depression does not significantly interfere with his ability to work . . . He does have a disturbance in attention and concentration which may be related to depression, and also in part to his current pain medication regime.  His attentional deficit limits his ability to deal with complex work environments and routines, but not simple work environments and routines." (*Id.* at 493)  Dr. Keyes opined that plaintiff had moderate impairments in his ability to understand, remember, and carry out complex instructions, as well as make judgments on complex work-related decisions. (*Id.* at 496-97)  Finally, Dr. Keyes indicated that plaintiff had a moderate degree of

---

[6]The GAF scale is used to report the "clinician's judgment of the individual's overall level of functioning" in light of his psychological, social and occupational limitations.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. text rev. 2000).  A GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social or occupational functioning.  A GAF of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

impairment in sustaining work performance and attendance in a normal work setting and in coping with pressures of ordinary work.  (*Id.* at 495)

### 2.  The administrative hearing

#### a.  Plaintiff's testimony

The ALJ conducted the remand hearing on January 27, 2010.  (*Id.* at 563-582) Plaintiff testified that he was born on May 4, 1964 and was forty-five years old on the date of the hearing.  (*Id.* at 567)  He last worked on June 14, 2005 as an operations lead shift operator.  (*Id.* at 570)

Plaintiff is married and lives with his spouse and children.  (*Id.* 567)  Plaintiff has a twelfth grade education but has difficulty reading and writing because he is dyslexic. (*Id.* at 568)  He is able to read the newspaper and can write down short messages. (*Id.*)  He has a driver's license.  (*Id.*)

Plaintiff is able to dress and bathe himself.  (*Id.* at 573)  He helps around the house with a little bit of laundry and a little bit of cooking.  (*Id.*)  He tries to help with yard work.  (*Id.*)  He watches television and listens to the radio.  (*Id.*)

Plaintiff is right-hand dominant.  (*Id.* at 569)  Plaintiff has had multiple shoulder operations and has the use of his right hand, but it is weak and has no strength to it. (*Id.*)  He uses his right hand, but cannot use it constantly.  (*Id.*)  Plaintiff is treated by Dr. McFarland, a shoulder specialist, who sees him every six months, although there is nothing Dr. McFarland can do for him.  (*Id.* at 570)

Plaintiff testified that he is unable to work because he only sleeps three to four hours a night due to shoulder pain, he is in constant pain unless he takes his pain pills, he has limited motion, he cannot lift with his right arm which is his dominant arm, and

14

he cannot focus.  (*Id.* at 570, 572)  The pain is on the top of the right shoulder.  (*Id.* at 571)  Plaintiff has constant tingling through the elbow, his three to four fingers are also tingling, and the tingling goes into the shoulder blade.  (*Id.*)  Plaintiff described the intensity as between six and seven on a scale of one to ten.  (*Id.*)  Nothing relieves the pain, although he takes Vicodin for the pain.  (*Id.* at 572)

In addition, the pain affects plaintiff's mood.  (*Id.* at 575)  He is not under psychological care and is not on medication.  (*Id.*)  Plaintiff testified that he was on medication in the past, but it did not help.  (*Id.*)  He further testified that the pain and depression sometimes cause memory problems and affect his ability to concentrate.  (*Id.* at 575-576)

Plaintiff testified that he can lift twenty to thirty pounds with his left hand and is limited to between five and eight pounds with his right hand.  (*Id.* at 574)  Plaintiff can reach over his head with his left hand and can comb his hair.  (*Id.*)  He has no problems standing, but cannot stand for long periods of time.  (*Id.*)  Similarly, he has no problems walking, but does not walk for long periods of time.  (*Id.*)  Plaintiff can sit but must shift his movement after every fifteen to twenty minutes.  (*Id.*)  Plaintiff wears glasses, has no hearing or breathing problems, and no problems with balance or dizziness.  (*Id.* at 575)

### b.  VE's testimony

At the hearing, the VE testified that plaintiff's vocational background consisted of work as a lead shift operator which is a heavy exertional level and semiskilled.  (*Id.* at 579)  Plaintiff also worked as a cabinet installer which is a semiskilled position of medium exertional level.  (*Id.*)  The VE opined that there were no transferrable skills to

15

the sedentary level. (*Id.*) In addition, the VE testified that symptoms like pain and

depression could have a vocational impact by reducing productivity. (*Id.*)

> The ALJ posed the following to the VE:

> So, if we have a hypothetical individual who is a younger individual with a high school education and prior relevant work history similar to that of the claimant and that this person suffers from persistent pain and depression, which would result in a loss of productivity of ten percent, that person would be unemployable?

(*Id.*) The VE replied, "yes sir, I believe so." (*Id.*)

> Next, the ALJ asked the VE:

> What if we have a hypothetical individual, a younger individual, with a high school education, prior relevant work history similar to that of the claimant? Assume that this person has no real function of the right arm. He can use it occasionally, but can't use it frequently or constantly and he can't do any overhead work with it. In addition, the hypothetical individual is able to sit, stand, and walk, you know, for eight hours during an eight-hour workday provided that he be given an opportunity to change positions for relief of postural discomfort. Assume that the person would be limited to just simple routine tasks that wouldn't involve a whole lot of, you know, concentration. It would be just at the basic unskilled level. With those limits, would this person be able to do any jobs?

(*Id.* at 580) The VE responded that such an individual could perform sedentary,[7]

unskilled jobs, including a security monitor, information clerk, and interviewer. (*Id.* at

580-81) On cross-examination, plaintiff's wife asked the VE how her answer would

---

[7]The Social Security Regulations define sedentary work as follows: "Sedentary-work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

change in the event that the hypothetical individual took pain medication every day. (*Id.* at 582)  The VE responded, "[t]here'd be no counter indication to that." (*Id.*)

### 3. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ determined that plaintiff had not been under any type of disability within the meaning of the Act from June 13, 2005 through the date of his decision.  The ALJ's findings are summarized as follows:[8]

1.  The claimant met the insured status requirements of the Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since June 13, 2005, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3.  The claimant has the following severe impairments:  status post right shoulder surgeries and depression (20 C.F.R. § 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).

5.  The claimant has the residual functional capacity to perform light work[9] as defined in 20 C.F.R. § 404.1567(b) with occasional, but not frequent or constant, use of the right arm and no overhead work, with the ability to

---

[8]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If some can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

sit/stand/walk for eight hours in an eight-hour workday, but must be able to change positions to relieve postural discomfort, and is further limited to simple, routine tasks at a basic unskilled level.

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on May 4, 1964 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined by the Act, from June 13, 2005, through the date of this decision (20 C.F.R. § 404.1520(g)).

(D.I. 12, Tr. 392-407)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence. See 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

"substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806

F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may

not undertake a de novo review of the ALJ's decision and may not re-weigh the

evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of "evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250(1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50( a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other

19

evidence-particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F .2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1 )(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

20

continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(1) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to

21

meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B. Whether ALJ's Decision is Supported by Substantial Evidence

On May 26, 2010, the ALJ found that plaintiff had not been under any type of

22

disability within the meaning of the Act from June 13, 2005, through the date of his decision. The ALJ concluded that, despite plaintiff's severe impairments (status post right shoulder surgeries and depression), he retained a RFC to perform light work with occasional, but not frequent or constant, use of the right arm and no overhead work, with the ability to sit/stand/walk for eight hours in an eight-hour workday, but must be able to change positions to relieve postural discomfort, and is further limited to simple, routine tasks at a basic unskilled level. After considering the VE's testimony, the ALJ concluded that plaintiff could not perform his past work, but could perform a significant number of other jobs in the national economy, including security monitor, information clerk, and interviewer.

Plaintiff seeks judgment for such relief as may be proper. He contends that the ALJ erred in not giving the opinions of his treating physicians controlling weight. Defendant contends that substantial evidence supports the decision that plaintiff was not disabled under the Act.

### 1. Medical opinions

Plaintiff appears pro se and, it seems, contends that the ALJ erred in not giving controlling weight to the opinions of his treating physicians. An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.").

23

In the opinion upon remand, the ALJ detailed his reasons for:  (1) affording no significant weight to the opinions of Dr. Smucker; (2) finding that Dr. Appiott's opinion is not supported by the record; (3) affording no controlling weight to the opinions of Drs. McFarland and Glaser; and (4) affording no significant weight to the opinion of Dr. Schanno.  (D.I. 12, Tr. 402-403)

Dr. Schanno opined that plaintiff appeared to have an addiction to Vicodin and that the addiction and right shoulder issues affected plaintiff's employability.  With respect to the ALJ's rejection of Dr. Schanno's opinion, the court concludes that the ALJ's finding is not supported by substantial evidence.  The evidence of record indicates that plaintiff has filled prescriptions for Vicodin throughout the relevant time period.[10]  Nor has plaintiff wavered in complaints of pain.  Further, while the ALJ provided a basis for his assignment of weight to the opinion of Dr. Schanno, in failing to recognize plaintiff's continued use of Vicodin, the ALJ did not consider the evidence of record.  Therefore, his decision is not supported by substantial evidence.  Remand is appropriate for a more comprehensive evaluation.

## 2. Hypothetical question

As the Third Circuit explained in *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984):

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical

---

[10]Rite-Aid Pharmacy records show that plaintiff filled prescriptions for Hydrocodone (a Vicodin generic):  (1) in 2007 on May 23, June 11, June 27, July 23, August 3, August 20, September 13, October 17, and December 10; (2) in 2008 on March 4, April 7, June 5, August 24, October 15, and December 8; and (3) in 2009 on January 6, March 18, April 29, May 29, July 20 and August 15.  (D.I. 12, Tr. 379-388)

questions posed by the ALJ to the vocational expert.  The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.

Reliance on an expert's answer to a hypothetical question will not constitute substantial evidence unless all credibly established limitations are included; remand is required where the hypothetical question is deficient. *Anderson v. Astrue*, 825 F. Supp. 2d 487, 498 (D. Del. 2011) (citations omitted).  "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

Third Circuit case law and governing regulations have provided guidance on whether a limitation is "credibly established:"

> [First, l]imitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response. [Second, and r]elatedly, the ALJ may not substitute his or her own expertise to refute such record evidence.  [Third, l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible-The ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason.  Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

25

The final responsibility for determining a claimant's RFC is reserved to the Commissioner. *Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (unpublished) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  At bar, the ALJ determined that plaintiff had the physical RFC:  (1) to perform light work (i.e., lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds); (2) with occasional, but not frequent or constant, use of the right arm and no overhead work; (3) with the ability to sit/stand/walk for eight hours in an eight-hour workday; (4) with the ability to change positions to relieve postural discomfort; and (5) to perform simple, routine tasks at a basic unskilled level.  (D.I. 12, Tr. 399-400)

The second hypothetical posed to the VE, whose response the ALJ relied upon in finding plaintiff "not disabled," did not accurately portray plaintiff's physical and mental impairments.  The hypothetical did not include reference to lifting requirements for light work, and it did not refer to limited pushing and/or pulling and reaching with the right upper extremity but, instead, stated generally, "can't do any overhead work".[11]  In addition, the ALJ gave considerable weight to Dr. Borek's RFC which found that plaintiff could sit about six hours in an eight-hour day, yet the hypothetical asked the VE to consider an individual who is able to sit for eight hours in an eight-hour workday, rather than six hours.

Finally, at the ALJ's request, plaintiff submitted to consultative psychological examination which took place after the January 27, 2010 remand hearing.  As

---

[11]Notably, in the remand order to the ALJ, the Appeals Council makes specific mention that, during the first hearing, the ALJ had failed to include in the hypothetical the limited pushing and/or pulling and reaching with the right upper extremity.  (D.I. 12, Tr. 418)

26

discussed above, Dr. Keyes' findings included that plaintiff suffered from a major depressive disorder, had borderline intellectual functioning, and had a moderate degree of impairment in sustaining work performance and attendance in a normal work setting and in coping with pressures of ordinary work. Dr. Keyes' findings were not included in the hypothetical posed to the VE.

The hypothetical questions posed to the VE did not accurately portray plaintiff's physical and mental impairments. Given the failure to include these factors, and the Third Circuit's mandate to include everything in a hypothetical based on the relevant physical and mental RFC's, remand is appropriate.

## V. CONCLUSION

For the reasons stated, the court remands the case for further proceedings consistent with this memorandum opinion. Plaintiff's motion for summary judgment will be granted and defendant's motion for summary judgment will be denied.

An appropriate order shall issue.